UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X

**M-10-731**

UNITED STATES OF AMERICA

    - against -

NAIRA JALOVIAN,
       also known as "Sandra,"

               Defendant.

---------------------------------X

SEALED AFFIDAVIT IN SUPPORT OF
COMPLAINT AND ARREST WARRANT
(18 U.S.C. § 1952(a)(3))

        SARA BRADY, being duly sworn, deposes and states that she is a Special Agent of Immigration and Customs Enforcement ("ICE"), duly appointed according to law and acting as such.

        Upon information and belief, on or about and between September 1, 2009 and June 23, 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NAIRA JALOVIAN, also known as "Sandra," together with others, did knowingly and intentionally travel in interstate commerce, with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of an unlawful activity, to wit: prostitution.

        (Title 18, United States Code, Sections 1952(a)(3) and 3551 et seq.)

        The source of your deponent's information and the grounds for her belief are as follows:[1]

        1.     I have been employed as a Special Agent with ICE for over two years.

        2.     Currently, I am assigned to the El Dorado Task Force at the ICE New York Field Office. In the course of this and other investigations, I have interviewed witnesses and

---

[1] Because the purpose of this complaint is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

1

confidential informants, reviewed immigration documents, conducted physical surveillance, and secured relevant information using other investigative techniques, such as undercover agents and consensual recordings.

3. As the co-lead investigative agent, I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, (c) recordings of telephone conversations and meetings between the defendant and an undercover agent of ICE; (d) information obtained from confidential sources of information, and (e) my review of the ICE and public records. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.

## Background

4. In or about April 2010, ICE developed information that the defendant NAIRA JALOVIAN, also known as "Sandra," was operating a "high-end" prostitution ring that obtained much of its business through advertisements posted online at the website www.eros.com. The investigation showed that the business operates as follows. JALOVIAN and certain employees, who she refers to as "bookers," field calls from potential "clients" responding to the online advertisements. JALOVIAN and her bookers arrange meetings between the clients and JALOVIAN's prostitutes for fees starting at several hundred dollars or more per sexual encounter. The prostitutes typically meet with clients at apartments JALOVIAN rents in midtown and other neighborhoods of Manhattan, New York. JALOVIAN herself lives in, and operates the ring from, an apartment located in Jersey City, New Jersey, and travels to Manhattan regularly to pick up the

2

proceeds from her prostitution business.

5. Subsequent investigative steps led to several recorded telephone calls and meetings between JALOVIAN and an undercover Special Agent of ICE ("UC"), who posed as a corrupt agent offering protection for JALOVIAN's prostitution ring. The recordings have confirmed that JALOVIAN oversees the prostitution ring and that JALOVIAN wants to employ corrupt law enforcement agents to avoid prosecution, eliminate competing prostitution rings and expand her business. According to JALOVIAN's recorded statements to the UC, her prostitution business nets $30,000 to $50,000 per month, and employs a "military surgeon" who has posed for a Playboy magazine photographer, an "elementary school teacher," an "Olympic" athlete, and a lingerie model, as prostitutes and/or as "bookers." According to JALOVIAN, her clientele are mostly wealthy businessmen and professionals, such as doctors and architects, from the greater New York metropolitan area, and businessmen visiting New York City.

### The Investigation

6. The UC consensually recorded his conversations with JALOVIAN, which are described below. In the descriptions set forth below, opinions are based upon my knowledge, training, and experience, as well as upon the results of the investigation to date. All conversations are set forth in substance and in part, and are based on preliminary, draft summaries of the conversations.

### The April 23, 2010 Telephone Conversation

7. On or about April 23, 2010, the UC and JALOVIAN spoke over the telephone. During the call, JALOVIAN described her prostitution business to the UC. JALOVIAN explained that she posted numerous advertisements on an internet website that described her

3

prostitutes as "independents" so they would not appear to be working for an agency. JALOVIAN appeared to believe that advertisements revealing her prostitutes to be working for an agency would more likely attract the attention of law enforcement. JALOVIAN stated that she posted numerous advertisements, typically for less than four weeks at a time. JALOVIAN explained that she charged most clients between $800 and $1,000 for each sexual encounter with one of her prostitutes.

8.  During the call, JALOVIAN asked the UC if he could arrest individuals who ran competing prostitution operations. The UC replied that he could "keep her safe" and "run" client names through computer databases to determine whether they worked for law enforcement. JALOVIAN told the UC that she was looking for someone in law enforcement to put on her "payroll" and "pay off."

### The April 23, 2010 Meeting

9.  Later that day, after additional telephone conversations, the UC met JALOVIAN at the Opia Bar and Lounge located on East 130th Street in Manhattan. JALOVIAN introduced herself as "Sandra," and asked the UC if he was "wired." To prove he was a bona fide law enforcement agent, the UC displayed his undercover credentials. JALOVIAN told the UC that she wanted to put the UC on her "payroll" and would not mind "sharing" her "money" with the UC. JALOVIAN told the UC that she wanted to "open an agency" online, instead of running her current business which involved posting "independent" advertisements, as a way to "generate more money . . . millions." She explained that the wealthiest clients preferred to deal with an agency.

10. JALOVIAN further told the UC that her clients were primarily "wealthy businessmen" and professionals, such as doctors. According to JALOVIAN, she steered clear of drugs, underage girls, and clients who were politicians or famous, because this would invite law

4

enforcement scrutiny. She described one of her prostitutes as being an elementary school teacher who teaches geometry, and another as a model who has posed in the catalogue for a lingerie company.

11. During the same conversation, JALOVIAN told the UC that her prostitution business generated approximately $30,000 to $50,000 per month after expenses. JALOVIAN told the UC that she saved very little and spent most of the proceeds on expenses like rent, drivers, "always fly[ing] first-class" and staying at "first-class" hotels.

12. During the meeting, JALOVIAN passed $500 to the UC under the table. The UC told JALOVIAN, "I want it to be to be strictly business, I do something for you, you pay for it." JALOVIAN responded, "Okay, well, if you gonna do something for me, I'll pay you for it." Later in the conversation JALOVIAN told the UC, "Relax, I gave you $500, she's (presumably an unidentified prostitute) making me $3,000 right now . . . Buy yourself a new tie . . . you work for me." JALOVIAN acknowledged that giving the UC $500 was a "bribe" that placed JALOVIAN and the UC in a "compromising position." JALOVIAN and the UC discussed what JALOVIAN wanted the UC to do for her. JALOVIAN asked if the UC could investigate her competitors. When the UC asked JALOVIAN what she wanted him to do to her competition, she answered, "Take them out."

### The April 26, 2010 Meeting

13. On April 26, 2010, JALOVIAN and the UC, by telephone and text messages, arranged to meet at Keens Steakhouse located on West 36th Street in Manhattan ("Keens"). During their meeting that night, JALOVIAN discussed her prostitution business with the UC. When the UC offered JALOVIAN "protection for your agency," JALOVIAN told the UC that she was

"comfortable" paying the UC 10% of "the whole revenue after . . . overhead." JALOVIAN showed the UC a list of individuals and internet advertisements that JALOVIAN described as her competition. JALOVIAN also asked the UC if he could investigate "a girl who worked for her" because JALOVIAN believed the girl was seeing a "major" client "on the side." JALOVIAN told the UC that she could put him on her "payroll" as soon as he started taking out her competitors.

### The April 29 and April 30, 2010 Telephone Calls

14. On April 29, 2010, the UC called JALOVIAN from a location in Brooklyn, New York, a fact which the UC mentioned during the call. The UC provided JALOVIAN with a new prepaid cellular telephone number that JALOVIAN could use to contact the UC.

15. During a telephone conversation the next day, April 30, 2010, the UC and JALOVIAN discussed a location on Second Avenue in Manhattan that JALOVIAN wanted to use for her prostitution business. JALOVIAN added that she had an apartment in "Midtown" Manhattan, which I believe was a reference to a location where her prostitutes met clients.

### The May 3, 2010 Meeting

16. On May 3, 2010, the UC met JALOVIAN at a Starbucks in Jersey City, New Jersey. JALOVIAN then brought the UC to an apartment located in Jersey City, New Jersey (the "apartment").[2]

17. Inside the apartment, the UC observed over one dozen cellular telephones on a table in the living room. While the UC and JALOVIAN were talking, JALOVIAN received a call on one of the cellular telephones. During the call, JALOVIAN - posing as one of the call girls -

---

[2] On June 24, 2010, a United States Magistrate Judge in the District of New Jersey issued a warrant to search the apartment.

6

---
pretended to be Dutch, and told the caller that she usually charges "7 or 8" hundred dollars, but since the caller wanted two girls it would be "12" hundred dollars. Afterwards, JALOVIAN counted out $800 and gave it to the UC. When the UC asked what JALOVIAN was doing, she responded that she was "bribing" him. JALOVIAN told the UC that the $800 represented 10% of the money JALOVIAN had earned from "bookings." JALOVIAN then showed the UC a small notebook that appeared to list several bookings that JALOVIAN described as "receipts," which I believe was for the purpose of assuring the UC that he was receiving his fair share. While inside the apartment, JALOVIAN used a laptop computer to show the UC her internet advertisements and those of a competitor on the website www.eros.com.

18. During their meeting, the UC instructed JALOVIAN not to tell any of her associates that she was working with a law enforcement agent. The UC asked JALOVIAN if she understood why. JALOVIAN replied that the UC could get "busted for conspiracy" and that she could get "busted for the [prostitution] ring."

19. During their meeting, JALOVIAN showed the UC the photographs of the handful of "girls" she currently was advertising on the website www.eros.com. As she went through the photographs with the UC, she described her employees as a former "Olympic" athlete; a "military surgeon" whose online photographs had been taken by a Playboy magazine photographer; a school teacher; and a lingerie model.

### The May 10, 2010 Meeting

20. On May 10, 2010, the UC met JALOVIAN at the Opia Bar and Lounge located on East 130th Street in Manhattan. During the meeting, the UC and JALOVIAN discussed the steps the UC had begun to take against her competitors. The UC told JALOVIAN that he had

7

provided information about her competitors to other law enforcement agents. JALOVIAN advised the UC that agents setting up sting-type operations should call to make appointments well in advance, using "out of town" telephone numbers, presumably because JALOVIAN believed this would make her competitors less suspicious.

21.     During this meeting, JALOVIAN also told the CI that she filed tax returns but claimed on her returns that she only made approximately $14,000 per year as a housekeeper. At one point, JALOVIAN handed the UC $1,000, which she described as "10%" of the business that week, though she also expressed some uncertainty about exactly how much she was going to net that week.

### The May 25, 2010 Meeting

22.     On May 25, 2010, the UC met JALOVIAN at Jane's Restaurant located on West Houston Street in Manhattan. During the meeting, JALOVIAN and the UC discussed operating a website-based "agency" together. JALOVIAN explained that if the UC "cleaned out" 50 to 70% of her competition, they could split the profits "50-50." With a website-based agency, JALOVIAN told the UC that she expected the UC to earn approximately $50,000 per month after the agency was up and running for approximately six months to a year. JALOVIAN again explained that her internet advertisements falsely described her prostitutes as "independents," rather than employees of her ring. JALOVIAN said she was now paying the UC 10% of the bookings to ensure her prostitution ring was not being investigated. JALOVIAN further instructed the UC that he had to "clean out" her competition before she opened a website agency. JALOVIAN told the UC she would not open an agency if the competition was still in business. The UC told JALOVIAN that with more money, the UC could pay other agents to go after her competition. JALOVIAN

responded, "That's so hot, let's do it." JALOVIAN handed the UC $1,500 under a table. JALOVIAN promised that after the UC closed down three of her competitors, she would open the website agency.

## Conclusion

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendant NAIRA JALOVIAN can be dealt with according to law.

Because of the nature of this application, I request that this affidavit and arrest warrant remain sealed pending further order of the Court.

Dated:   Brooklyn, New York
         June 25, 2010

SARA BRADY
Special Agent
Immigration and Customs Enforcement

Sworn to before me this
This 25th day of June, 2010